UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUZANNE CRONK,

          Plaintiff,

                                    Case No. 16-11616

v.

                                    Paul D. Borman

DOLGENCORP, LLC, d/b/a          United States District Judge
DOLLAR GENERAL,

          Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Suzanne Cronk worked for Defendant Dolgencorp, LLC, d/b/a Dollar General, from 2011 until she was discharged in 2014. In this action, she alleges that Defendant violated her rights under the Family and Medical Leave Act ("**FMLA**"), 29 U.S.C. § 2601 *et seq*., in two respects: by interfering with her ability to take leave to which she was entitled by the FMLA, and by retaliating against her for exercising her rights under the FMLA. Defendant contends that Plaintiff was terminated for violating its policy regarding incidents of shoplifting.

Now before the Court is Defendant's Motion for Summary Judgment. For the reasons set forth below, taking the facts in the light most favorable to Plaintiff, the non-moving party, Plaintiff has not met the burdens she must meet for either claim to survive summary judgment. Accordingly, the Court grants Defendant's

Motion for Summary Judgment.

## I.     BACKGROUND

**A.     Plaintiff's Employment with Defendant and Defendant's Relevant Employment Policies**

Defendant hired Plaintiff as a cashier at its Lewiston, Michigan store on August 10, 2011. (ECF No. 12, Def.'s Mot. Ex. A, Deposition of Suzanne Cronk at 9:23-10:4.) The following May, Plaintiff was promoted to assistant store manager. (Cronk Dep. 10:5-8.)

In February of 2013, at Plaintiff's request, she was transferred to Defendant's store in Cheboygan, Michigan and promoted to store manager. (Cronk Dep. 10:9-11, 13:17-14:1.) Then in May of 2013, after learning that the store manager at the Lewiston location had been fired, Plaintiff put in a request to district manager Patricia Dotson to be transferred back to the Lewiston store and work as store manager there. (Cronk Dep. 17:18-18:1.) Dotson agreed to Plaintiff's request, and Plaintiff managed the Lewiston store from May of 2013 until her termination in September of 2014. (Cronk Dep. 10:12-15, 19:4-13, 39:11-17.)

In the course of her employment with Defendant, Plaintiff received a copy of Defendant's Employee Handbook, and had access to documents containing Defendant's Standard Operating Procedures. (Cronk Dep. 13:9-16.) Plaintiff admitted that she was familiar with both. (Def.'s Mot. Ex. C, Plaintiff's Responses to Defendant's Request for Admissions ("**Plaintiff's RFA**") ¶¶ 3,7 at 2-3, Pg ID

124-125.) Two of Defendant's policies that were set forth in those materials are relevant here: Defendant's FMLA leave policy, and Defendant's shoplifting prevention policy.

### 1. Defendant's FMLA Leave Policy

Defendant's family and medical leave programs, which include Defendant's FMLA leave program, are administered by a third-party vendor called Matrix Absence Management ("**Matrix**"). (Plaintiff's RFA Ex. 1, FMLA Leave Policy Excerpt of Employee Handbook at 6, Pg ID 128.) The version of the Employee Handbook in effect at the time relevant to this case provided that "[a]fter notifying his or her manager of the need for leave, **the employee should immediately initiate a leave request with Matrix**" by calling a phone number or by filing a request through the Matrix website, both of which were provided in the Employee Handbook. (*Id.* (emphasis in original).) In a separate section called "Leave Requirements: Employee Notice," the Employee Handbook relevantly provides as follows:

> An employee must provide the Company with 30 days advance notice before FMLA leave is to begin if the need for leave is foreseeable: for example, if need for leave is based on an expected birth, placement for adoption or foster care, or planned medical treatment for your own or a family member's serious health condition. However, if 30 days advance notice is not practical or possible (e.g., an emergency), the employee must give notice as soon as practicable. To report the need for leave and initiate the approval process the employee must follow

the steps below. Absent unusual circumstances, failure to comply will result in a delay or denial of the employee's FMLA Leave request.

The employee must provide notification to his or her manager as soon as the need for leave is known and provide the expected dates that the employee will not be at work.

After notifying his or her manager, the employee (or someone on the employee's behalf) must immediately contact Matrix . . . to report the leave of absence and initiate the leave approval process.

(*Id.* at 8, Pg ID 130.)

In a similar vein, the Standard Operating Procedures provide that "[t]o request FMLA [leave], . . . the employee must contact Matrix" at the same phone number as is specified in the Employee Handbook. (Plaintiff's RFA Ex. 2, FMLA Leave Policy Excerpt of Standard Operating Procedures at 14, Pg ID 136.) The Standard Operating Procedures further provide:

Employees must immediately notify their manager of any leave request. Generally, when the need for leave is foreseeable, the employee should provide the manager and Matrix Absence Management 30 days advance notice or as soon as possible when 30 day advance notice is not possible.

(*Id*.)

Plaintiff admitted that the Employee Handbook directs employees requesting FMLA leave to notify their supervisors and immediately contact Matrix. (Plaintiff's RFA ¶ 5 at 3, Pg ID 125.) Plaintiff also admitted that "[t]he Standard Operating Procedures state in part that Matrix notification is required for leave approval determination." (Plaintiff's RFA ¶ 9 at 3, Pg ID 125.)

4

### 2.    Defendant's Shoplifting Prevention Policy

Defendant's Shoplifting Prevention Policy urges employees to use a "proactive, non-confrontational approach" which is encapsulated in a four-step method called "ASAP." (Def.'s Mot. Ex. B, Declaration of Justin Lambright, Ex. 2 ("**Shoplifting Prevention Policy**").) The "ASAP" policy instructs employees who suspect a customer of shoplifting to "Approach Immediately," "Smile from 5 feet away," "Ask a 'Face Saving Question,'" and "Proactively Offer Assistance." (Shoplifting Prevention Policy at 11-12, Pg ID 117-118.) The Shoplifting Prevention Policy expressly states: "Never touch anyone suspected of shoplifting or touch his or her personal belongings." (*Id*. at 13, Pg ID 119.)

After its summary of the "ASAP" approach, the Shoplifting Prevention Policy contains a section entitled "Shoplifter Stops." (*Id*. at 14, Pg ID 120.) This section of the policy states that "[m]embers of store management are the only store employees allowed to make a shoplifting apprehension." (*Id.*) The parties do not dispute that Plaintiff was a member of store management. The policy states that "[if the ASAP] approach fails, a member of management may make a shoplifting stop or apprehension only if all the following steps have been taken." (*Id*.) The policy then lists eight steps: the member of management must (1) observe the suspect take a store item; (2) see the suspect conceal the item; (3) ensure that the suspect is in view of a member of store management at all times; (4) ensure that

the suspect has passed all points of purchase and not offered payment for the concealed items; (5) approach the suspect with a sales associate and know where the item is located; (6) say "Excuse me, I believe you may have forgotten to pay for (concealed item)"; (7) escort the suspect to the register and ask how he or she wishes to pay for the item; and (8) allow the suspect to purchase the item and leave. (*Id.*) If the suspect cannot pay for the merchandise or refuses to produce it, the policy instructs the manager to ask the suspect to remain at the cash register area, contact law enforcement and specified company personnel, and seal "[a]ll evidence kept from a shoplifting case" in a bag to be kept in the store office. (*Id.* at 15, Pg ID 121.) If the suspect does not remain, the policy directs the manager to obtain a description of the suspect, to get a description of the suspect's vehicle and license plate number (if this can be done without leaving the store), and to contact law enforcement and specified company personnel. (*Id.*)

In two separate sections, the Shoplifting Prevention Policy states that "[a]t no time should [an employee or manager] go outside of the store [after] a suspected shoplifter." (*Id.* at 14-15, Pg ID 120-121.)

## B.     First Shoplifting Incident (**March 2014**)

In March of 2014, Plaintiff caught a customer shoplifting after seeing her conceal certain items in her purse, pay for certain other items at the cash register, and leave the store without paying for the items in her purse. (Cronk Dep. 25:20-

27:3.) Plaintiff testified that she waited outside of the front of the store for the customer to emerge, and when the customer did, she asked the customer whether she had items that she had not paid for. The customer responded that she did not. Plaintiff asked to look inside the customer's purse, and when the customer refused her request, Plaintiff threatened to call the police. The customer relented, handed Plaintiff her purse, and followed Plaintiff to an office inside the store. There, Plaintiff instructed the customer to sit, put the customer's purse on the floor, and called the authorities. She then called Dotson, who as Plaintiff's district manager was her immediate supervisor, informed Dotson that she had caught a shoplifter, and alleges that Dotson congratulated her. (Cronk Dep. 27:5-28:8.)

## C.    First Conversation Regarding FMLA Leave (July 2014)

At some point during or prior to February of 2013, Plaintiff injured her wrist while working at a cash register. She first sought medical treatment for that injury on or around February 13, 2013. (Cronk Dep. 31:15-32:13.)

On July 11, 2014, Plaintiff called Dotson to discuss her wrist injury. (Cronk Dep. 17:23-18:1, 32:21-33:18.) Plaintiff testified that she informed Dotson that the injury was painful and affecting her work, and that a doctor who had been treating her with cortisone shots believed she needed surgery. Plaintiff told Dotson that she would have to take medical leave to have the surgery in December of 2014, both because the store would be too busy until then for her to take leave earlier, and

because she would have to have the surgery before the end of the calendar year to be able to pay the deductible with benefits that her husband had accrued at his job. (Cronk Dep. 34:3-35:24.) According to Plaintiff's testimony, Dotson responded that Plaintiff could not take the leave in December of 2014 because the store would be too busy. Plaintiff responded that she needed the surgery because she could not tolerate the pain any longer, and that because of the deductible she had to have it before the end of 2014; Dotson simply reiterated that she could not have the surgery in December.[1] (Cronk Dep. 35:25-36:12.) Plaintiff did not provide Dotson with any alternative dates for her surgery.

Plaintiff admitted that she "did not contact Matrix to seek leave in 2014 for carpel tunnel surgery." (Plaintiff's RFA ¶ 10 at 3, Pg ID 125.)

**D.    Second Shoplifting Incident (August 2014)**

The Lewiston store incurred another shoplifting incident later in the summer. On or around August 10, 2014, Plaintiff noticed two women enter the store whom

---

[1] Dotson gave a very different account of her conversations with Plaintiff about her surgery and possible leave. She testified that Plaintiff never identified a timeframe within which she would have to have the surgery, and she flatly denied that she told Plaintiff that she wouldn't be able to take medical leave in December of 2014. On the contrary, Dotson testified, she told Plaintiff that "[w]hen it comes time you will call the leave department, Matrix, and they will set you up with leave." (Def.'s Mot. Ex. D, Deposition of Patricia Dotson at 36:1-25.) She also testified that as district manager she did not have authority to grant or deny FMLA leave. (Dotson Dep. 44:7-12.) Defendant points out that Dotson has a differing account of these conversations, but also states that "for purposes of this Motion only, [it] will accept Plaintiff's version of the facts as true." (Def.'s Mot. at 12 n.1.)

the staff had suspected of shoplifting in the past. The women split up inside the store, and as Plaintiff approached one of them, she saw the customer kneeling and putting toy cars inside of her purse. When the customer noticed Plaintiff was watching she took them out and put them on the shelf. Plaintiff asked the customer if she could help her, and the customer said no, and hurried to the cash register to pay for some items. (Cronk Dep. 40:3-25.)

After looking around for the other customer, Plaintiff found her at the cash register, and noticed that the customer's bag looked bigger than it had when she came in, and that she wasn't paying for DVDs that Plaintiff had seen her holding. (Cronk Dep. 41:2-9.) Plaintiff testified as follows about what happened next:

> [A]fter she got done paying for her items I went next to her and I said, do you have any items in your purse that you didn't pay for. And she pushed past -- she tried pushing past me and going out the door. . . . And I just grabbed onto the handle of her purse . . . and told her, I said, you're going to have to show me what's in your purse. And she was trying to get out that door.

> Well, then she wanted to go to the bathroom and she was pushing her way towards the bathroom. And I wouldn't let go of her purse. And then I had the phone and I was -- I had 911 on. And I had three employees that were standing there watching this go on.

(Cronk Dep. 41:11-25.)

The incident is further described in a statement that Plaintiff wrote approximately three weeks after the incident at the behest of Justin Lambright, a Regional Loss Prevention Manager for Defendant. (Lambright Decl. ¶¶ 2, 7; Cronk

Dep., Ex. 3, Handwritten Report, 9-3-14, Pg ID 104-106 ("**Handwritten Report**").) In the Handwritten Report, Plaintiff characterized her interaction with the suspected shoplifter in the following way:

> When she finished paying for the items in her basket, I walked up to her [and] asked her if I could look into her purse. She told me that I couldn't. When I asked her why, she said it was because she had personal items in there. She was trying to push past me, so I informed [her] if she would not let me look into her purse, I would have to call 911 and let the police look into it. She said that was fine [and] continued to try to push past me to the front door. My cashier Shannon [Lemanski] ran over to block the door so she could not get out. [The suspect] was then pulling at the strap of her purse [and] was trying to get it off of her. I held my hand on the strap of the purse [and] would not let it go. She then said that she needed to go to the bathroom. I said that it was fine if she went, but I was going in there with her. She was yelling [and] screaming that she was innocent, [and] that she had young kids that she had to get to. She pushed her way over to the front corner of feminine hygiene, [and] shoved her hand into her purse, grabbed 5 DVDs, [and] threw them on the floor. My cashier Shannon witnessed her do this. She was yelling they fell off of the shelf, [and] that. Shannon and I had put our stories together. . . . Within about 5 more minutes, the police officer walked in. I was very happy to see her walk in, [and] she informed me that I could let go of her purse. She asked her, myself, [and] Shannon questions about what happened. She took [the suspect] outside to get her side of the story. When I went outside I asked the officer what items she had left in her bag. She had . . . U of M hoodies, makeup remover pads, [and] a few other items. The officers took her away in the patrol car.

(Handwritten Report at 25-26, Pg ID 105-106.) Asked at her deposition if there was anything in the statement she would correct or change, Plaintiff testified that

the only thing she did not put in the statement was that she did not direct Lemanski to block the door, and that Lemanski "did that on her own." (Cronk Dep. 50:2-7.)

Surveillance video taken at the time of the incident recorded the interaction between Plaintiff and the suspect, and Defendant attached two video clips of approximately 35 seconds each as an exhibit to its Motion. (Def.'s Mot. Ex. E, Surveillance Video.) The video clips are consistent with Plaintiff's account in the Handwritten Statement, and they are unambiguous about two important facts: Plaintiff clearly put her hands on the suspect's purse (which was strapped to her body) in an attempt to prevent her from leaving, and Lemanski clearly attempted to block the suspect from exiting through the front door.

Asked at her deposition if there was anything important about the incident that was not reflected in the surveillance video, Plaintiff testified that the video did not reflect "[h]ow [the suspect] tried to get to the bathroom. She wanted in the bathroom. . . . So she was -- kept pushing over that way, towards the bathroom. She kept saying she wanted to use the bathroom. With her purse." (Cronk Dep. 48:21-49:6.)

At some point after the incident, Plaintiff called the employer of the two women involved in the shoplifting incident, described the incident to their supervisor (with whom Plaintiff was acquainted), and informed him that one of them had been arrested. Plaintiff did not obtain corporate permission to do this.

(Cronk Dep. 51:7-16.)

On or around September 3, 2014, Lambright visited the store. He reviewed the surveillance videos with Plaintiff and discussed the incident, and then directed Lemanski and Plaintiff to write separate statements describing the incident. (Cronk Dep. 43:13-48:20.) The statement that Plaintiff wrote is the Handwritten Report quoted above at page 10; Lemanski's statement was attached by Defendant as an exhibit to a sworn declaration by Lambright. (Lambright Declaration Ex. 1 at 8-9, Pg ID 114-115.) Lemanski's statement indicated that Plaintiff "grabbed [the suspect's] purse as she was walking away." (*Id*. at 8, Pg ID 114.)

### E.     Second Conversation Regarding FMLA Leave (September 2014)

Plaintiff testified that after her first conversation with Dotson regarding her wrist injury and need for medical leave in July of 2014, her relationship with Dotson became more distant. She did not discuss the issue with Dotson again until September. (Cronk Dep. 67:22-68:6.)

Plaintiff's second conversation with Dotson on the topic occurred on September 4, 2014, the day after Lambright's visit to the store. (Cronk Dep. 57:20-24.) On that date, Plaintiff called Dotson from the parking lot outside of a doctor's office where she had just had an appointment to be tested for carpal tunnel syndrome. Plaintiff testified that she told Dotson that the doctor had completed the test, and that "this surgery is going to happen. He's sending me on." (Cronk Dep.

37:17-38:11.) To Plaintiff's recollection, Dotson did not say anything in response but did not seem particularly upset,[2] and they proceeded to discuss store business. (Cronk Dep. 38:22-39:10.)

**F.  Plaintiff's Termination (September 2014)**

The topic of surgery came up for the last time on September 13, 2014, the day on which Plaintiff was terminated. (Cronk Dep. 39:11-16.) Plaintiff testified that Dotson came into the store that morning and looked as though she was in a hurry. Plaintiff said to Dotson that she needed to discuss her upcoming surgery with her, but Dotson replied that she needed "to go do something" and went to the office in the store. (Cronk Dep. 51:25-52:10.) About 15 minutes later Dotson called Plaintiff into the office. Dotson mentioned Lambright's visit the previous week, and told Plaintiff that the company had decided to terminate her over the August 2014 shoplifting incident. (Cronk Dep. 54:11-55:14.)

Plaintiff testified that Dotson told her that she was being terminated because of how she handled the incident, but could not recall anyone telling her what specifically about what she did was improper. (Cronk Dep. 58:6-16.) In her

_____

[2] Plaintiff's testimony is somewhat inconsistent about what Dotson said in this conversation. She testified at one point in her deposition that Dotson did not say anything in response to her assertion that she needed to have the surgery (Cronk Dep. 38:22-38:24), but then testified later in the deposition that in this conversation, Dotson told her again that she could not take time off in December for the surgery (Cronk Dep. 57:20-58:2).

deposition, Dotson testified that the reason for Plaintiff's termination was that she violated the company's policy for dealing with shoplifters when "[s]he physically touched a customer and held them in the store" by holding on to the suspect's purse to physically prevent her from leaving. (Dotson Dep. 12:21-13:16.) Dotson further testified that while Plaintiff had been cited for performance issues on at least one occasion in the past, her termination was not for sub-standard performance, nor was she terminated for telling anyone about the arrest that followed the shoplifting incident (Dotson Dep. 17:7-20, 20:4-14, 35:4-11).

Plaintiff testified that she ultimately had her carpal tunnel surgery on January 16, 2015, because the rules regarding her husband's employment benefit had changed such that the benefit would not expire at the end of 2014, and so she could use it to pay her deductible. (Cronk Dep. 64:12-65:7.) Plaintiff and her husband learned of this rule change in late November of 2014. (Cronk Dep. 65:17-66:3.)

## G.    Procedural History

Plaintiff filed this Complaint on May 5, 2016 in the Northern Division of the District Court for the Eastern District of Michigan. (ECF No. 1, Compl.) The case was subsequently transferred to the Southern Division for docket efficiency.

Plaintiff makes two distinct claims: that Defendant unlawfully denied her FMLA leave (Count I), and that by terminating her Defendant retaliated against her

for exercising her rights under the FMLA (Count II). (Compl. ¶¶ 14-18.)

On January 20, 2017, Defendant filed the present Motion for Summary Judgment. (ECF No. 12, Def.'s Mot.) Plaintiff filed her Response on February 10, 2017. (ECF No. 18, Pl.'s Resp.) Defendant filed a timely Reply on February 24, 2017. (ECF No. 21, Def.'s Repl.) The Court heard argument on the Motion on April 27, 2017.

## II.    STANDARDS OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (internal citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v.*

*Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 324.

"The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). In other

words, he or she "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote omitted).

In determining whether there are genuine issues of material fact for trial, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). At the same time, that party must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, . . . or is not significantly probative, . . . the court may grant judgment." *Anderson*, 477 U.S. at 249–50. Plaintiff cannot meet his or her "burden by relying on mere '[c]onclusory assertions, supported only by [her] own opinions.'" *Green v. Central Ohio Transit Authority*, 647 F. App'x 555, 558 (6th Cir. 2016) (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008)) (alterations in original). Plaintiff "must show sufficient probative evidence, based 'on more than mere speculation, conjecture, or fantasy,' that

would enable a jury to find in her favor." *Green*, 647 F. App'x at 558-59 (quoting

*Arendale*, 591 F.3d at 601).

Finally, all evidence submitted in opposition to a motion for summary

judgment must ultimately be capable of presentation in a form that would be

admissible at trial:

> The submissions by a party opposing a motion for summary judgment
> need not themselves be in a form that is admissible at trial. . . .
> However, [that party] must show that she can make good on the
> promise of the pleadings by laying out enough evidence that will be
> admissible at trial to demonstrate that a genuine issue on a material
> fact exists, and that a trial is necessary. Such "'evidence submitted in
> opposition to a motion for summary judgment must be admissible.'"
> *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting
> *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185,
> 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be
> disregarded.'" *Ibid*. It is also the basis of this court's repeated
> emphasis that unauthenticated documents do not meet the
> requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

## III.    DISCUSSION

Two separate provisions of the FMLA underpin this action. Title 29 U.S.C.

§ 2615(a)(1) (the "**interference provision**") makes it "unlawful for any employer

to interfere with, restrain, or deny the exercise of or the attempt to exercise, any

right provided under [the FMLA]." Title 29 U.S.C. § 2615(a)(2) (the "**retaliation**

**provision**") makes it "unlawful for any employer to discharge or in any other

manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." Plaintiff has brought one claim against Defendant under each provision: Count I under the interference provision, and Count II under the retaliation provision.

## A.    Count I – Interference under the FMLA

Count I of the Complaint, entitled "Violation of Substantive Rights Under FMLA," asserts that Plaintiff sustained various damages "[a]s a direct and proximate result of Defendant's violation of Plaintiff's rights under the [FMLA.]" There is some initial ambiguity as to what precisely the alleged violation of Plaintiff's substantive FMLA rights was—specifically, whether it was Dotson's alleged denial of Plaintiff's request for leave, whether it was the termination itself, or whether it was both.

The ambiguity is understandable in view of the case law that governs FMLA interference claims. Although the United States Court of Appeals for the Sixth Circuit has clearly established that the interference and retaliation provisions give rise to "two discrete theories of recovery under the FMLA," it has just as clearly "held that a claim for retaliatory discharge is cognizable under either theory." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (collecting cases). Set against this legal backdrop, the Complaint could be interpreted as attempting to plead an interference claim based on Plaintiff's

termination *or* based on Dotson's alleged denial of her request for FMLA leave, and so the Court will analyze both possibilities.

Plaintiff must make the same *prima facie* showing for her interference claim to survive summary judgment whether the basis for that claim is denial of benefits or termination:

> To establish a claim for interference under the FMLA, a plaintiff must demonstrate that (1) he is an eligible employee, (2) the defendant is an employer as defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled.

*Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).

For the reasons set forth below, whether Plaintiff's interference claim is based on Dotson's statements or on her termination, Plaintiff has not made the factual showings required to defeat Defendant's summary judgment motion on Count I.

## 1. Interference Claim – Denial of Leave

Accepting Plaintiff's account of the conversations she had with Dotson about her intention to take FMLA leave—as the Court must, on this summary judgment motion—Dotson told Plaintiff on one or more occasions that she would not be allowed to take leave in December of 2014. To the extent that Count I is

20

based on the theory that Dotson's statements themselves constituted interference with Plaintiff's FMLA rights independently from her termination, Plaintiff supports this theory with language from one of the FMLA's implementing regulations, which states that "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b); *see also Saroli v. Automation & Modular Components*, Inc., 405 F.3d 446, 454 (6th Cir. 2005) (holding that an employer's offering the plaintiff a shorter leave period than the FMLA required without telling her her rights under the law, and then demoting her when she returned after taking leave for a longer period, was "sufficient to create the necessary inference that defendants discouraged [the plaintiff] from exercising her rights").

At the same time, though, the Sixth Circuit has made clear that "the FMLA is not a strict-liability statute. Employees seeking relief under the [interference] theory must therefore establish that the employer's violation caused them harm . . . '[The FMLA] provides no relief unless the employee has been prejudiced by the violation[.]'"). *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507–08 (6th Cir. 2006) (internal citations omitted) (quoting *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 89 (2002)); *see also Tilley v. Kalamazoo Cty. Rd. Comm'n*, 654 F. App'x 675, 680 (6th Cir. 2016) (holding that a plaintiff had not raised a jury question on a

discouragement theory of FMLA interference where the employer made only "de minimis contact" with him and there was evidence that the Plaintiff still intended to exercise his FMLA rights after the alleged discouragement). For this reason, "[a]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request." *Weimer v. Honda of Am. Mfg., Inc.*, 356 F. App'x 812, 818 (6th Cir. 2009) (quoting *Arban v. West Publishing Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)).

Thus to whatever extent Count I is premised on the theory that Dotson's statements discouraged Plaintiff's exercise of her FMLA rights, that theory only has merit if Plaintiff's termination—which occurred well before the time Plaintiff planned to take leave, based on what she told Dotson—was itself based on her conversations with Dotson, rather than any legitimate, non-pretextual reasons. Plaintiff was terminated prior to her planned leave. If that termination was for reasons "not related to . . . her FMLA request," *id.*, then she has not shown that Dotson's leave statements in themselves caused her harm. For this reason, the "discouragement" theory is not an independent basis for Plaintiff's interference claim, and so the FMLA claim's viability depends on a retaliatory discharge theory.

## 2. Interference Claim – Retaliatory Discharge

As a threshold matter, Plaintiff argues that Defendant has a heightened burden in this case because she has presented direct evidence of discriminatory animus: namely, the fact that Plaintiff "advised Dotson that she intended to exercise her rights under FMLA in December and Dotson told her that she could not." (Pl.'s Resp. at 13.) As Plaintiff argues, "[t]here was no discussion of alternatives or any intention expressed by Dotson to permit [Plaintiff] to exercise her rights in some other fashion. Dotson simply indicated that [Plaintiff] would not be able to exercise the leave she requested." (*Id.*) Plaintiff compares this case to *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696 (6th Cir. 2008), in which the plaintiff had testified that before he took FMLA leave and was fired upon his return, his supervisor "told me [that] if I took . . . FMLA [leave for the requested period of time] . . . there would not be a job waiting for me, when I returned." *Id.* at 708. On that fact, the Sixth Circuit held that because the plaintiff had presented direct rather than circumstantial evidence of an improper motive behind the plaintiff's termination, "the burden shift[ed] to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.* at 707 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004). Plaintiff maintains that the same holds true here.

*Daugherty* is inapposite. "Direct evidence" is defined in that decision as

evidence which "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part" by an unlawful motive. *Daugherty*, 544 F.3d at 707 (quoting *DiCarlo*, 358 F.3d at 415)*.* This definition was met in *Daugherty* because Alexander, the superior who told the plaintiff in that case that "there would not be a job waiting" for him if he took FMLA leave, "was Daugherty's immediate supervisor and a decision maker at [the defendant company]. A fact finder would not be required to draw any inferences to determine that Alexander retaliated against Daugherty when Alexander explicitly threatened such retaliation and the threat . . . was realized." *Id.* at 708.

Here, by contrast, a reasonable fact-finder could not conclude that Plaintiff was fired for retaliatory reasons without having to draw any inferences. Dotson's statement to Plaintiff ("not in December") was not as clear and categorical as Alexander's in *Daugherty*, and the fact that the statement in *Daugherty* was an unequivocal threat (which the employer then made good on) was central to the Sixth Circuit's determination. Moreover, a fact-finder in this case would have to make the inference that the time that had elapsed between Plaintiff's first mention of her plan to take leave (in July of 2014) and her termination (in September of 2014) did not attenuate a causal connection between Dotson's knowledge of Plaintiff's plan and the decision to terminate her. A fact-finder would also have to

infer that Dotson was either the sole decision-maker or at least that she influenced other decision-makers. In short, at least some degree of inference would be required to conclude that there was a retaliatory motive at play, and this refutes Plaintiff's argument that Dotson's statement constitutes direct evidence of improper motive.

Absent direct evidence, a court analyzing an FMLA interference claim should apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (holding that Sixth Circuit precedent requires the application of the *McDonnell Douglas* framework to FMLA interference claims based on indirect evidence, and not merely to retaliation claims) (citing *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)). Thus, "a successfully pleaded prima facie case, either for FMLA interference or retaliation, would shift the burden to [the defendant] to present a legitimate, nondiscriminatory reason for its decision to terminate" the plaintiff. *Id.* at 761. If the defendant carries this burden, the plaintiff's claims will survive summary judgment only if he or she can show that the defendant's stated reasons are pretextual. *Id* at 761–62.

There is no dispute that the first three elements of the FMLA interference *prima facie* standard are met in this case: Plaintiff was an eligible employee, Defendant was an employer as defined under the FMLA, and Plaintiff was entitled

to medical leave under the FMLA. The fourth and fifth prongs of the test—whether Plaintiff gave Defendant notice of her intention to take leave, and whether Defendant denied Plaintiff FMLA benefits to which she was entitled—are less than clear.

Defendant argues that Plaintiff has not raised a genuine issue of material fact on the fifth prong, maintaining that Plaintiff was not denied benefits to which she was entitled because she was not denied benefits at all. This is so, Defendant contends, because Plaintiff has admitted that she did not initiate a leave request with Matrix, as required by the procedures laid out in the Employee Handbook and the Standard Operating Procedures.

This argument is well supported in the law. In a subprovision entitled "Complying with employer policy," the FMLA's implementing regulations provide as follows:

> An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. . . . An employee also may be required by an employer's policy to contact a specific individual. Unusual circumstances would include situations such as when an employee is unable to comply with the employer's policy that requests for leave should be made by contacting a specific number because on the day the employee needs to provide notice of his or her need for FMLA leave there is no one to answer the call-in number and the voice mail box is full. Where an employee does not comply with the employer's usual notice and procedural requirements, and no

> unusual circumstances justify the failure to comply, FMLA–protected
> leave may be delayed or denied. . . .

29 C.F.R. § 825.302(d).

*Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608 (6th Cir. 2013), is instructive on this issue. In that case, the Sixth Circuit affirmed summary judgment in favor of a defendant on an FMLA interference claim, finding that the defendant had not interfered with the plaintiff's FMLA rights because the plaintiff had not reported his FMLA leave by calling a number specified in the Defendant's policy, despite the fact that he had told company personnel (including a supervisor) that he would be absent. *See id.* at 615 (concluding that "an employer may enforce its usual and customary notice and procedural requirements against an employee claiming FMLA-protected leave, unless unusual circumstances justify the employee's failure to comply with the employer's requirements"); *see also Perry v. Am. Red Cross Blood Servs.*, 651 F. App'x 317, 328 (6th Cir. 2016) (plaintiff was not denied FMLA benefits to which she was entitled because she had not contacted a third-party administrator to report FMLA leave as required by employer's policy); *Norton v. LTCH*, No. 13-13730, 2014 WL 4473339, at *4–6 (E.D. Mich. Sept. 9, 2014) (same).

Plaintiff has not claimed that she was unable to comply with Defendant's FMLA Leave Policy by initiating a leave request with Matrix, or identified any other "unusual circumstances" that would justify an exception to this rule. Plaintiff

admitted in discovery that she did not initiate a request in this way, and also admitted that both the Employee Handbook and the Standard Operating Procedures instruct employees to do exactly that in order to request FMLA leave. (Plaintiff's RFA ¶¶ 1-10 at 2-3, Pg ID 124-125.) Under 29 C.F.R. § 825.302(d) and *Srouder*, Defendant would have been justified in outright denying Plaintiff permission to take medical leave at any point until she complied with the FMLA Leave Policy. Since Plaintiff never initiated a request with Matrix, it cannot be said that Defendant denied her an FMLA benefit to which she was entitled. Accordingly, Plaintiff has not raised a genuine issue of material fact on the fifth prong of the *prima facie* case.[3]

Plaintiff does not address Defendant's argument from 29 C.F.R. § 825.302(d) and from *Srouder*, and instead maintains that because Defendant's FMLA Leave Policy only requires 30 days' notice, she was "fired before the Matrix reporting requirement was triggered." (Pl.'s Resp. at 12.) But this only

_____

[3] In their briefs, the parties do not address the fourth prong of the *prima facie* standard: that "the employee gave the employer notice of his intention to take leave." *Tennial*, 840 F.3d at 308. The Sixth Circuit made clear in *Srouder*, however, that even if a plaintiff satisfies the notice element, there is still no issue of fact over whether the plaintiff was denied FMLA benefits to which he or she was entitled if the plaintiff failed to comply with the employer's leave procedures and has not shown "unusual circumstances." *See Srouder*, 725 F.3d at 615 (holding that "regardless of whether [plaintiff] provided sufficient FMLA notice to [defendant] . . . , [defendant] was nevertheless justified in terminating [plaintiff]'s employment for his failure to follow the call-in requirements of [defendant]'s attendance policy"). Because Plaintiff has failed to meet the fifth element of the *prima facie* standard, the Court need not analyze whether she has met the fourth.

establishes that she didn't violate the policy in some way – not that she took the affirmative steps required to initiate a leave request.

In short, Plaintiff cannot make a meritorious interference claim based on the theory that Defendant interfered with her right to FMLA leave by terminating her, because she had not complied with Defendant's procedures for initiating a leave request, and thus was not denied FMLA leave to which she was entitled. To whatever extent Plaintiff claims that Defendant terminated her because Dotson knew she *intended* to request and then take FMLA leave, that is appropriately analyzed as a retaliation claim, which is discussed below.

The Court also notes that where an employee's leave is foreseeable, the FMLA requires the employee to "make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer," subject to the approval of the treating health care provider. 29 U.S.C. § 2612(e)(2)(A). Even drawing all reasonable inferences in Plaintiff's favor, the record does not suggest that Dotson told Plaintiff that she could not take leave at all—merely that she could not do so in December. Plaintiff testified that the store would be especially busy in December; she never proposed scheduling her leave earlier than December, and indeed never proposed any alternative months. (Cronk Dep. 34:3-35:10, 36:13-37:16.) Thus, the record lacks any indication of any effort by Plaintiff to avoid unduly disrupting her employer's critical December sales revenue. This

strengthens the inference that Plaintiff was not denied leave to which she was entitled.

Because Plaintiff did not comply with Defendant's FMLA Leave Policy by contacting Matrix and/or ever requesting leave other than in December, she has not raised a jury question on whether she was denied leave to which she was entitled. For that reason, the Court will grant summary judgment to Defendant on Count I.

**B.      Count II – Retaliation under the FMLA**

The *prima facie* standard for FMLA retaliation claims differs somewhat from the analogous standard in FMLA interference claims. To satisfy it in the absence of direct evidence, Plaintiff must show with circumstantial evidence that

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald*, 667 F.3d at 761. And as discussed above in the context of interference claims based on theories of retaliatory discharge, the *McDonnell-Douglas* burden-shifting analysis is employed when a plaintiff has "successfully pleaded [a] prima facie case, either for FMLA interference or retaliation." *Id.* In that event, the burden shifts to the defendant to "present a legitimate, nondiscriminatory reason for its decision" to terminate the plaintiff; if that burden is met, the claim can only

survive summary judgment if the plaintiff can show that the defendant's "stated reasons are a pretext for unlawful discrimination." *Id.*

Defendant does not argue that a reasonable jury could not find the first three prongs of the *prima facie* standard met in this case. Instead, Defendant argues that Plaintiff's case fails on the fourth prong (causation), and alternatively, in the pretext analysis.

Defendant asserts that a "but-for" causation standard applies to FMLA retaliation claims, but the law is not as clear on this proposition as Defendant indicates. In fact, there is authority contrary to and stronger than the single, unpublished FMLA retaliation case that Defendant cites. That authority suggests that a much lower standard applies: "The burden of proof at the prima facie stage [of an FMLA retaliation claim] is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (quoting *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir. 2007)). In fact, the Sixth Circuit in *Seeger* found that the causation prong was met by temporal proximity only, and held that the plaintiff in that case had met his burden on causation based on the fact that the adverse action took place "less than two months after [plaintiff] first notified [defendant] of his medical leave." *Seeger*, 681 F.3d at 283-84 (concluding that the

plaintiff "has shown causality by a preponderance of the evidence through close temporal proximity that is suggestive of retaliation"). The *Seeger* decision is clear that when the employer's learning of the employee's protected activity and the adverse employment action are close enough in time, no further evidence of causation is needed to "meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge" under the FMLA. *Id.* at 283. That period in *Seeger* was slightly under two months, while in this case it was slightly over two months. In the absence of any other distinguishing factors between the cases, *Seeger* compels the conclusion that Plaintiff has satisfied the causation prong of the *prima facie* standard.

The burden therefore shifts to Defendant to articulate a legitimate, nonretaliatory reason for Plaintiff's termination, and Defendant has stated one: she was fired for violating the Shoplifting Prevention Policy's prohibition on employees or managers making physical contact with suspected shoplifters or their belongings. Plaintiff must therefore show that this explanation is pretextual to avoid summary judgment. This requires her to show that "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 (6th Cir. 2009)).

Even if she makes this showing, Defendant can still prevail if it is "able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. . . . [T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Romans*, 668 F.3d at 839 (internal citations and quotation marks omitted).

Plaintiff asserts that Defendant's stated reason did not actually motivate the decision to fire her, and she makes two distinct arguments to this effect: that the Shoplifting Prevention Policy does not actually establish that Plaintiff did anything wrong, and that Defendant's explanation is pretextual in any case because Plaintiff violated the Shoplifting Prevention Policy earlier in the same year but was not terminated or even disciplined then.

Neither argument has merit. First, the Shoplifting Prevention Policy expressly states that an employee may "[n]ever touch anyone suspected of shoplifting or touch his or her personal belongings." (Shoplifting Prevention Policy at 13, Pg ID 119.) And although the same policy at other times does refer to "Shoplifter Stops" and a manager's ability to "make a stop" (*Id*. at 14, Pg ID 120), nothing in the policy contradicts the express prohibition on physical contact with suspected shoplifters, and so it is more than reasonable for Defendant to interpret the policy as contemplating "stops" that do not involve physical contact. In fact, the specific steps that the policy directs managers to take in the event of a

shoplifting incident make this even clearer: the manager is to "[r]equest the suspect to accompany you to the register area" and "[a]sk him or her to remain" there, and to contact law enforcement and company authorities whether the suspect remains on the premises or not. (*Id.* at 15, Pg ID 121.) The policy is unequivocal that physical contact is forbidden.

Second, Plaintiff's comparison of the situation that led to her termination with the shoplifting incident earlier in the year overlooks a crucial distinction between the two incidents: the later incident involved physical contact with the suspect—or at least with the suspect's personal belongings, which is no less prohibited under the policy—while the earlier incident did not. Plaintiff's testimony suggests that the suspect in the earlier incident voluntarily complied with Plaintiff's requests and does not, in any event, indicate that Plaintiff initiated physical contact with her. And while Plaintiff also violated a different part of the policy in the earlier instance by exiting the store to confront the suspect, it would here again be reasonable for Defendant to regard Plaintiff's actions in the second incident as more egregious and therefore warranting Plaintiff's termination more

than her actions in the first incident did.[4]

Plaintiff also argues that while Dotson was given the same information about Plaintiff's conduct immediately following each incident, she only chose to investigate the second incident (which happened after she had learned of Plaintiff's intention to take FMLA leave), and not only did not investigate the first incident (which happened before any conversations between Plaintiff and Dotson about FMLA leave), but actually congratulated Plaintiff for catching a shoplifter. But the record does not support the claim that Dotson was acting on the same information in both situations. Plaintiff testified that after the first incident, she called Dotson and said "I have a shoplifter, I have her up in the office. I took her purse, it's sitting on the floor. I'm waiting for the police to get here." (Cronk Dep. 27:21-28:6; Dotson Dep. 41:4-14.) Nothing about this statement suggests a violation of any policy by Plaintiff. Absent any indication of misconduct, a reasonable interpretation of the statement would have been that Plaintiff acted in accordance with Defendant's Shoplifting Prevention Policy by asking the shoplifter to wait with her in the store until the police arrived—and Plaintiff's testimony reflects that

---

[4] Plaintiff's citation to *Dotson v. Pfizer, Inc.*, 558 F.3d 284 (4th Cir. 2009), does not support this argument. Besides the fact that this Fourth Circuit decision is not binding on this Court, it is factually distinguishable in that the policy used to justify the termination of the plaintiff in that case had substantial and material ambiguities in it, and the comparator employees who were not fired committed the same violations as the plaintiff. *See id*. at 296-97. Neither of these factors is present here.

that is what she did. (Cronk Dep. 27:5-28:8.) Plaintiff also testified that the shoplifter in the first incident voluntarily gave Plaintiff her purse, unlike the shoplifter in the second incident, who physically resisted Plaintiff. (Cronk Dep. 27:11-14, 41:11-25.) In the final analysis, the discrepancy between Dotson's reactions to the two incidents that is urged by Plaintiff is not supported in the record. Defendant has shown reasonable reliance on particularized facts so as to defeat any inference of pretext.

Lastly, Plaintiff presents a list of what she identifies as "questions of fact" which could themselves be construed as pretext arguments. (Pl.'s Resp. at 15.) None of them is any more availing to Plaintiff than the pretext arguments examined above, since none creates an inference that the decision to terminate Plaintiff was not actually motivated by her handling of the August 2014 shoplifting incident. The fact that the Shoplifting Prevention Policy does not require discharge for any particular type of violation does not mean that Defendant acted unreasonably in exercising its discretion to terminate Plaintiff. In addition, the fact that Lemanski was not discharged for violating the Shoplifting Prevention Policy by blocking the door does not itself demonstrate that Plaintiff's firing was pretextual: Lemanski, who had less experience and seniority than Plaintiff, was not similarly situated as an employee, and her violation was less serious. "Differences in job title, responsibilities, experience, and work record can be used to determine

whether two employees are similarly situated." *Mencarelli v. Alfred Williams & Co.*, 656 F. App'x 80, 85 (6th Cir. 2016) (quoting *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004)). Finally, Plaintiff has presented no reason to conclude that Dotson's delay of five days before contacting Lambright about the second shoplifting incident shows any improper motive behind the subsequent decision to fire Plaintiff, nor any reason to conclude that Lambright's additional delay of fifteen days before visiting the store has any relevance to the question at all.

Even though Plaintiff has put forward enough evidence to meet her burden at the *prima facie* stage, she has not shown that Defendant's stated reason for her termination was pretextual. Accordingly, the Court will grant summary judgment to Defendant on Count II as well.

## IV. CONCLUSION

For the reasons stated above, the Court hereby GRANTS Defendant's Motion for Summary Judgment in its entirety.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: May 22, 2017

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 22, 2017.

s/D. Tofil
Deborah Tofil, Case Manager